**ORIGINAL**

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | **FILED** |
|---|---|---|
| RAYMOND REUDY and KEVIN HICKS dba ADVERTISING DISPLAY SYSTEMS, | ) ) ) | No. C-02-5438 SC  APR – 3 2007 |
| Plaintiffs, | ) ) | REPORT AND RECOMMENDATION |
| v. | ) ) | BY SPECIAL MASTER |
| CLEAR CHANNEL OUTDOORS, INC., a Delaware corporation, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

### INTRODUCTION

The parties requested that the Special Master prepare a "Tentative Ruling" on their submitted motions prior to both the oral argument on these motions on March 2, 2007, and the Special Master's issuing of a final "Report and Recommendation by Special Master" to the Federal District Court. A Tentative Ruling was issued on February 26, 2007, and a hearing was subsequently held at the JAMS offices in San Francisco, California on March 2, 2007. Having considered the arguments made at the hearing and the parties' subsequent letter briefing the Special Master is now prepared to issue a final Report and Recommendation.

Two sets of motions were referred to the Special Master, the

Honorable Eugene F. Lynch (Ret.):[1]

The *first* set concerns Plaintiffs Raymond Reudy's and Kevin Hicks'

("Plaintiffs") initial lawsuit, filed in June 2002, against Defendant Clear

Channel Outdoor, Inc. ("Clear Channel"), alleging violations of Business

and Professions section 17200.[2] Based on recent changes to the San

Francisco Planning Code, Clear Channel has filed a Motion for Summary

Judgment, arguing that these recent legislative developments require that the

Court *abstain* from entertaining any equitable remedy sought by Plaintiffs,

and further requires that the case be *dismissed* to allow the City to adjudicate

any issues related to Clear Channel's signs.[3]

The *second* set of motions addresses Plaintiffs' recent lawsuit, filed in

August 2006, against Defendants Clear Channel, William Hooper

("Hooper"), CBS Corporation ("CBS") and Patrick Roche ("Roche")

(collectively "Defendants.")[4] Plaintiffs' complaint alleges intentional

---

[1]Both sets were referred by the Honorable Judge Samuel Conti, of the United States District Court for the Northern District of California.

[2] Raymond Reudy and Kevin Hicks individually and doing business as Advertising Display Systems (Plaintiffs) vs. Clear Channel Outdoor, Inc., a Delaware corporation (Defendants) [Case No. C-02-5438-SC.]

[3] As stated above, Clear Channel has also filed an Amended Motion for Dismissal, Judgment on the Pleadings and Summary Judgment, and a Second Amended Motion for Dismissal, Judgment on the Pleadings and Summary Judgment. All rely on the same argument as the Motion for Summary Judgment, *i.e.*, the abstention doctrine.

[4] Raymond Reudy and Kevin Hicks dba Advertising Display Systems and ADS-1, a California limited liability company (Plaintiffs) vs. Clear Channel Outdoor, Inc., a Delaware corporation, William Hooper, an individual, CBS Corporation, a Delaware corporation, Patrick Roche, an individual, and Does 1-50 (Defendants) [Case No. C-06-5409-SC.]

interference with prospective economic advantage, public and private

nuisance, Sherman Act violations and unjust enrichment. All Defendants

have filed 12(b)(6) motions to dismiss, arguing Plaintiffs have failed to state

claims upon which relief may be granted. In addition, CBS and Roche argue

the entire action against them is barred by a Release and Covenant not to sue

they entered into with Plaintiffs in December 2003. Plaintiffs have filed

Oppositions to all the motions.

## FACTS

### Brief Overview of the Relevant Regulations regarding Advertising Signs in the City & County of San Francisco

Outdoor advertising companies, such as Plaintiffs' and Defendants',

lease their sign locations from real property owners and rent their sign space

to advertisers.[5] These outdoor advertising signs are regulated under the City

Planning and Building Codes. Pursuant to these regulations, a permit is

required in order for an outdoor advertising company to legally maintain and

operate a general advertising sign anywhere in the City, and the installed

sign must conform to the permit issued for that sign at that location.

In 1965 the San Francisco Sign Ordinance, the City's most sweeping

sign regulation overhaul to date, was adopted. It defined business signs and

---

[5] In their 2006 complaint Plaintiffs allege Clear Channel and CBS each possess approximately 47.5% of the outdoor advertising sign market.

general advertising signs, and set forth specific permit requirements for the erection, placement, replacement, reconstruction, relocation or expansion of any sign.

San Francisco Planning Code section 604.1 was enacted on May 18, 2001, and gave outdoor advertising sign companies and property owners one year from the effective date of the legislation to find and post on each sign in operation its' permit number and permitted dimensions. If no permit could be located, then the owner of the sign was allowed to apply for and obtain an "in-lieu identifying number," to be posted in lieu of posting a permit number, provided that it was established that a permit had been lawfully issued in the first instance.[6]

Proposition G, passed in March 2002, added Planning Code section 611, which prohibited the issuance of permits for any *new* general advertising signs in the City, and amended section 602.7 to redefine a general advertising sign to mean a sign "legally erected prior to the effective date of section 611."

Most recently, Section 604(h) of the San Francisco Planning Code was amended, effective July 22, 2006, to specify examples of permissible

---

[6] Defendant Clear Channel has filed 220 in lieu permit applications with the City Planning Department and Defendant CBS has filed 94.

4

maintenance and repairs.[7] Similarly San Francisco Planning Commission Resolution No. 17258, adopted on June 8, 2006, adopted criteria for the legalization of existing general advertising signs.

In addition, the City enacted Planning Code section 604.2, titled "General Advertising Sign Inventories." It requires any entity that owns a general advertising sign in the City to submit and maintain complete inventories of its signs for the purpose of allowing the City to review the compliance of each sign with the City's regulatory scheme. Under this new law every general advertising company must submit an inventory of its signs, along with an inventory processing fee.[8]

## Procedural History of the Litigation

In January 2002, Plaintiffs commenced their initial action against Clear Channel in San Francisco Superior Court. Plaintiffs' original complaint alleged two causes of action against Clear Channel, the first for

---

[7]This provision provides: "(h) Unless otherwise provided in this Code or in other Codes or regulations, a lawfully existing sign which fails to conform to the provisions of this Article 6 may remain until the end of its normal life. Such sign may not, however, be replaced, altered, reconstructed, relocated, intensified or expanded in area or in any dimension except in conformity with the provisions of this Code, including Subsection (i) below. Ordinary maintenance and minor repairs shall be permitted, but such maintenance and repairs shall not include replacement, alteration, reconstruction, relocation, intensification or expansion of the sign; provided, however, that alterations of a structural nature required to reinforce a part or parts of a lawfully existing sign to meet the standards of seismic loads and forces of the Building Code, to replace a damaged or weathered signboard, to ensure safe use and maintenance of that sign, to remediate hazardous materials, or any combination of the above alterations shall be considered ordinary maintenance and shall be allowed. A sign which is damaged or destroyed by fire or other calamity shall be governed by the provisions of Sections 181(d) and 188(b) of this Code."

[8] This fee was established by recently enacted Planning Code Section 358 and sets the fee at $560 per sign.

5

unfair competition, and the second for unfair business practices, both pursuant to Business and Professions Code section 17200, *et seq*.

Plaintiffs' case was based on allegations that Clear Channel's operation, maintenance and use of approximately 385 billboards, rooftop and wall signs (general advertising signs) were in violation of various provisions of the San Francisco Planning and Building Codes, and that Clear Channel's activity deprived Plaintiffs of the opportunity and right to fairly compete. Based on their interpretation of the local ordinances and Proposition G, Plaintiffs argued that Clear Channel was required to remove the signs in lieu of bringing them into compliance with the Codes.

Clear Channel removed the action to the Federal District Court in November 2002,[9] and the parties stipulated to Plaintiffs filing an amended complaint, which included claims for both unfair competition and nuisance. In December 2002, Clear Channel moved to dismiss, and the court issued an order dismissing Plaintiffs' nuisance claim.

Clear Channel thereafter sought a stay of the action, based on the doctrine of primary jurisdiction, to allow the City time to implement enforcement of its own sign ordinances pursuant to the "In Lieu Permit Number" process created under Section 604.1 of the Code. A stay order was

---

[9] In November 2002, Plaintiffs commenced a second action against Defendant Clear Channel in Alameda Superior Court, alleging similar facts, and it too was removed to federal court and consolidated with the present action.

issued in April 2003, and continued until June 2004, when it was partially

lifted in order that discovery could commence as to the first phase of 25

signs.

In December 2003, while the Clear Channel action was pending,

Plaintiffs and CBS entered into an Agreement whereby CBS purchased

seven billboards from Plaintiffs for $2 million dollars. As part of the

Agreement, the parties entered into a "Release" which provided that

Plaintiffs released CBS "from any and all causes of action," and furthermore

specifically provided that Plaintiffs would not "commence any litigation,

arbitration or other proceeding" against CBS "that is similar in any way to

the action . . . against Clear Channel."

In November 2004, the Clear Channel case was ordered to the Special

Master. Plaintiffs thereafter again sought leave to amend the complaint to

add additional claims under the Racketeer Influenced Corrupt Organizations

Act ("RICO") and the Sherman Act. However, Plaintiffs' proposed Second

Amended Complaint, and the proposed RICO and antitrust causes of action

therein, were later withdrawn.

Plaintiffs next filed a Motion for Leave to File a Third Amended

Complaint to add new causes of action for interference with contract and

prospective economic advantage, public and private nuisance, and unjust enrichment.[10]

After reviewing the motion, the Special Master recommended: (1) that leave to amend to add a cause of action for nuisance should *not* be granted because Plaintiffs had failed to allege some "special injury" arising out of the alleged nuisance, as was originally found by Judge Conti; (2) that the amendment to allege the cause of action for interference with contract and prospective economic advantage be allowed; and (3) that amendment to add a cause of action for unjust enrichment be denied because unjust enrichment is not a separate cause of action, but is tied to other causes of action.

In November 2005, the Special Master heard three days of testimony and took evidence on the factual foundational issues related to each of the 25 signs for which the stay had been lifted. On May 8, 2006, the Special Master issued findings of fact on the factual history of each of these 25 signs.

In late May and early June, the Special Master took evidence on the legal issues concerning Plaintiffs' standing to bring their Section 17200 claim, and whether Plaintiffs were entitled to a mandatory injunction.

---

[10] This motion for leave to file a third amended complaint was referred to the Special Master for a "Report & Recommendation" by order dated October 28, 2005.

However, after Clear Channel began presentation of its evidence, the parties

agreed to halt the hearing in order to attempt to mediate the dispute. After

two days of mediation the parties were unable to resolve the case.

In August 2006, Plaintiffs filed a new complaint against Clear

Channel, as well as Hooper, CBS, and Roche. This complaint alleges causes

of action for nuisance, unjust enrichment, monopolization and intentional

interference with an economic relationship. The above described set of

motions was thereafter filed.

## DISCUSSION

### I. Applicable Standards for Summary Judgment, Judgment on the Pleadings and Dismissal

Federal Rule of Civil Procedure 56, subsection (c) provides that

summary judgment shall be granted if "the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." (*Anderson* v.

*Liberty Lobby, Inc*. (1986) 477 U.S. 242, 247-248.)

"Judgment on the pleadings is proper when the moving party clearly

establishes on the face of the pleadings that no material issue of fact remains

to be resolved and that it is entitled to judgment as a matter of law." (*Hal*

*Roach Studios, Inc. v. Richard Feiner & Co., Inc.* (9th Cir. 1989) 896 F.2d 1542, 1550; Rule 12(c).)

Rule 12(b)(6) provides for dismissal if the complaint fails to state a claim upon which relief may be granted. "A complaint should not be dismissed under Rule 12 (b)(6) 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' [Citation.] Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." (*Balisteri v. Pacifica Police Dept.* (9th Cir. 1988) 901 F.2d 696, 699.)

II. Clear Channel's Motion for Summary Judgment, Judgment on the Pleadings, or Dismissal

Clear Channel argues that the Court should *abstain* from entertaining any equitable remedy sought by Plaintiffs, and dismiss the action in order to allow the City to adjudicate any issues related to Clear Channel's signs. The Special Master initially finds that although Clear Channel moves for summary judgment, judgment on the pleadings or dismissal, it appears from Clear Channel's argument and reliance on the abstention doctrine that the underlying basis of the motion is actually one for *dismissal*.

The doctrine of abstention is summarized as follows: "Where [an unfair competition law] action would drag a court of equity into an area of

complex economic [or similar] policy, equitable abstention is appropriate."

In such cases, it is primarily a legislative and not a judicial function to

determine the best economic policy. (*Shamsian v. Dept. of Conversation*

(2006) 136 Cal.App.4th 621, 641-642; *see also Desert Healthcare District v.*

*Pacifcare, FHP, Inc.* (2001) 94 Cal.App.4th 781; *CA Growers Assn. v. Bank*

*of America* (1994) 22 Cal.App.4th 205; and *C. Sterling Wolfe v. State Farm*

*Fire & Casualty Insurance* (1996) 46 Cal.App.4th 554.)

Clear Channel points to the recently enacted legislation which it

argues supports their abstention argument because it indicates an intent by

the City to enforce its' sign regulations (*i.e.*, amended Planning Code section

604(h), Planning Commission Resolution No.17258 and recently enacted

Sections 358 [inventory processing fee] & 604.2 [advertising sign

inventories.])  Clear Channel also argues that there is a risk of duplication of

effort and a potential for inconsistent results if the abstention doctrine is not

applied.

Plaintiffs argue[11] that the abstention doctrine should not apply given

the City's limited personnel and funding for enforcement of its advertising

---

[11] Initially, Plaintiffs argue Judge Conti has already considered and ruled on this issue, rejecting Clear Channel's arguments.  The Special Master has reviewed the relevant portion of the transcript hearing and finds this is not an accurate statement of the Court's holding (RT 8/04/06.)

sign regulations.[12] Plaintiffs assert that the City has been "dragging its feet" on enforcement, *i.e.*, Plaintiffs call Clear Channel's view of future sign code enforcement "Pollyannic" because Plaintiffs claim the City has failed to enforce existing violations for years and are still years away from future enforcement. Relying on a Letter by the San Francisco Zoning Administrator Lawrence B. Badiner, Plaintiffs claim that the City actually supports private party lawsuits such as theirs to assist with the enforcement of its Codes.

Plaintiffs also argue that the new inventory provision is not "enforcement" and has only generated a one-time fee of approximately \$465,000. Citing to a Declaration by Robert Passmore, a former employee with the City as a Planning and Zoning Administrator, they argue that the best current estimate from the City Planning staff is that enforcement on these inventoried signs will not begin for at least three years.

Finally, Plaintiffs argue that Clear Channel misreads the current Code which Plaintiffs argue (as they have before) requires any sign re-built or re-constructed at the same location to constitute a *new* sign prohibited under Planning Code Section 611(a), and thus Resolution 17258 (permitting

---

[12]Plaintiffs' Opposition contains supporting Declarations regarding conversations with several employees in the City Planning Department, *i.e.*, Passmore, and Hicks. Clear Channel has objected to some of the information contained in the Hicks and Passmore declarations as inadmissible hearsay. The Special Master has reviewed the Declarations, and although their consideration is not necessary in making a Recommendation, it does appear the declarations contain hearsay evidence, *i.e.*, Hicks and Passmore are summarizing statements made by others in the Department.

legalization) is in *conflict* with the existing City Code.[13] In their Response

Plaintiffs thus request a *prohibitory* injunction requiring Clear Channel to

stop using its signs.[14]

In his Tentative ruling the Special Master, having reviewed the

abstention cases cited by Clear Channel, acknowledged that Clear Channel

had made a plausible argument regarding abstention. However, the Special

Master also noted that in the cases cited by Clear Channel, it was arguable

that broader and more complex matters of economic and/or social policy

were implicated. (*Shamsian v. Dept. of Conversation* (2006) 136

Cal.App.4th 621 [beverage recycling laws]; *Desert Healthcare District v.

Pacifcare,FHP,Inc.* (2001) 94 Cal.App.4th 781 [healthcare services

contracts]; *California Grocers Assn. v. Bank of America* (1994) 22

Cal.App.4th 205 [bank service fees]; *C. Sterling Wolfe v. State Farm Fire &

Casualty Insurance* (1996) 46 Cal.App.4th 554 [earthquake insurance].)

Furthermore, application of the abstention doctrine would result in a

*dismissal* of Plaintiffs' claims. Thus the Special Master at that time

concluded that application of the abstention doctrine appeared premature.

---

[13] The Special Master notes that any issue concerning a potential conflict between the City's newly enacted general advertising sign laws and the City's Planning Department procedures is not properly before the court at this time, and if to be legally tested, should be the subject of a separate lawsuit.

[14] However, throughout the history of this case Plaintiffs have sought a *mandatory* injunction requiring Clear Channel to take down the general advertising signs Plaintiffs allege are illegal. The Special Master does not find that the type of relief sought is material to application of the primary jurisdiction doctrine, and furthermore Plaintiffs have not attempted to establish the prerequisites for such extraordinary relief.

Having considered the parties arguments at the March 22nd hearing, the

Special Master still finds abstention and dismissal to be inappropriate at this

time.

Therefore, the Special Master recommends that the Court, as in its

original Order of April 11, 2003, continue to stay the action pursuant to *the*

*doctrine of primary jurisdiction.* As Judge Conti explained in his April 11,

2003 Order, primary jurisdiction applies when enforcement of a claim which

is originally cognizable in the courts requires the resolution of issues which,

under a regulatory scheme, have been placed within the special competence

of an administrative body. Under these circumstances the judicial process is

*suspended* pending referral of such issues to the administrative body for its

views. (*See Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377,

390.)

"[T]he primary jurisdiction doctrine advances two related policies: it

enhances court decision making and efficiency by allowing courts to take

advantage of administrative expertise, and it helps assure uniform

application of regulatory laws. No rigid formula exists for applying the

primary jurisdiction doctrine. Instead, resolution generally hinges on a

court's determination of the extent to which the policies noted above are

implicated in a given case." (*Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th at pp.391-392.)

Given the recent legislation and funding that was passed to address billboard compliance, this principle appears to be even *more* applicable now than at the time of Judge Conti's original order. As set forth in the Planning Commission Executive Summary under "benefit of Legislation," the purpose of the newly enacted section 604.2 is to provide a cohesive mechanism and funding for undertaking a comprehensive review of all general advertising signs located with the City to assure Code compliance, timely process code violations, and pursue the removal of nonconforming signs.

The Special Master acknowledges that Plaintiffs may believe the City's enforcement procedures are unsatisfactory, but that is insufficient to prevent a Court from deferring to the City's expertise. Plaintiffs fail to cite to any authority under either the abstention or primary jurisdiction doctrines that support denying a stay simply because the City is allegedly ineffectively enforcing its sign ordinance[15]. Furthermore, even assuming Plaintiffs could establish a Section 17200 case, the City, with its expertise in these specialized land use issues, is better suited to more effectively and quickly address whether a sign is illegal under the applicable ordinances, and should

---

[15] In fact at lease one case suggests this is not a basis for refusing to apply the abstention doctrine (*see C. Sterling Wolfe* v. *State Farm Fire & Casualty Insurance, supra,* 46 Cal.App.4th at p.568.)

15

be given the opportunity to do so. (*CA Growers Assn. v. Bank of America, supra,* 22 Cal.App.4th at p.218-219.) The newly enacted inventory processing fee will assist in this endeavor and provide the necessary resources to the City to enforce code compliance.

Thus the Special Master finds that given the required sign inventories and additional funding, along with the amendments outlining the types of corrective actions permissible, the City has indicated its intent to address sign compliance issues, is in the best position to do so, and therefore should be given the opportunity.[16] However, the Special Master also believes that abstention and dismissal is not warranted under these facts, and therefore a stay be issued pursuant to the doctrine of primary jurisdiction.

In the Special Master's Tentative Ruling it was recommended that the stay apply also to the 25 signs for which Judge Conti lifted his earlier stay. The Special Master also noted that he was aware of the interests of Plaintiffs and their concern that the City promptly enforces its sign regulations. Thus the Special Master recommended in the Tentative Ruling that Plaintiffs should be afforded an opportunity to periodically check in with the Court or the Special Master to determine if progress is in fact being made toward enforcement of the sign regulations, and suggested a hearing be held every

---

[16] The Special Master also notes that no authority is cited regarding application of the doctrine of primary jurisdiction that would prevent Plaintiffs from suing *the City* if it is not properly enforcing its sign regulations.

16

six to eight months either before the Court or Special Master in order to review the City's progress on enforcement.

Pursuant to the arguments of the parties at the March 2nd hearing the Special Master still recommends, that a stay be enforced which would include the 25 signs for which the original stay was lifted, and that in November 2007 a date be set for a status conference which would include the parties and the City. At that time either Judge Conti or the Special Master can reevaluate whether the City has effectively begun enforcement of its' sign regulations.[17] Also at that time a determination can be made as to whether the stay should remain in place, the case should be dismissed, or that the evidentiary hearing regarding the 25 signs (reduced to approximately 18 by actions of both parties) be resumed, briefed and concluded.[18]

III. The Release Agreement

On December 15, 2003, Plaintiffs entered into a Purchase and Sale Agreement with Defendant CBS Corporation.[19] Pursuant to that Agreement,

---

[17] Plaintiffs have attempted to subpoena City records regarding the in lieu permit process, inventory processing and enforcement status. Both the City and Clear Channel object to the subpoena. At the March 22nd hearing the Special Master informed the parties that a recommendation regarding this matter would be considered separately, after Judge Conti had determined whether to adopt the Special Master's Report and Recommendation.

[18] It appears to the Special Master that only a day or two of testimony is required to complete the hearing as to the 25 signs at issue.

[19] Plaintiffs have sued CBS Corporation, which is an indirect parent of CBS Outdoor Inc. CBS Outdoor Inc. owns and operates the outdoor advertising signs in the San Francisco metropolitan area. CBS Outdoor Inc. was formerly Viacom Outdoor Inc.

17

Defendant CBS paid Plaintiffs \$2 million in exchange for seven outdoor advertising signs. The parties also entered into a written Release Agreement, which provided that Plaintiffs released Defendant CBS from "any and all causes of action . . . arising from or relating to the conduct of business by [CBS] . . . including but not limited to the maintenance and operation of any advertising structures and advertising displays in the City . . . *as well as the permitting and compliance with the requirements of such permits for any and all such advertising structures and displays*." (Emphasis added.) The Release also provided that Plaintiffs would not sue any of CBS' employees, including Defendant Roche.

The interpretation of a release is governed by the same principles applicable to any other contract (*General Motors Corp. v. Sup. Ct.* (1993) 12 Cal.App.4th 435, 443.) Defendants CBS and Roche argue that under ordinary principles of contract interpretation the Release bars all of the claims set forth in Plaintiffs' Complaint.

First, Defendants argue the language of the Release is *clear and unambiguous*, evidencing the parties' intent to bar *all* claims arising out of the maintenance, operation and permitting of CBS' outdoor advertising

signs.[20] Defendants argue that the allegations in Plaintiffs' Complaint which form the basis for their interference, antitrust, nuisance and unjust enrichment claims, are all based on the operation, maintenance and permit status of Defendants' signs, which they argue is exactly the subject matter addressed by the Release.

Second, Defendants argue that at the time the parties executed the Release they were aware of the Clear Channel case *and made specific reference to it*, *i.e.*, the Release *specifically* refers to the case *by name* and states Plaintiffs will not commence litigation that is similar in any way to this case.

The Special Master agrees with Defendants that under ordinary principles of contractual interpretation it appears that the intent of the parties was to prevent Plaintiffs from initiating a suit like the present one. As Defendants argue, this is made particularly evident by reference to the Clear Channel case in the Release language. However, Plaintiffs attack the validity of the Release Agreement itself. They argue that the Release is *void and unenforceable* because it attempts to exculpate Defendants from willful conduct in violation of Civil Code Section 1668.

---

[20] Additionally, the Release specifically included reference to California Civil Code section 1542, which allows for release of unknown claims.

19

Section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

In reply, Defendants, citing *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92 and *Madison v. Superior Court* (1988) 203 Cal.App.3d 589, argue that Section 1668 is inapplicable because the statute only applies to "contracts of public interest." Furthermore, Defendants argue that the case law has limited the application of Section 1668 to "new" or "future" conduct.

Plaintiffs, citing *Health Net of Cal., Inc. v. Department of Health Services* (2004) 113 Cal.App.4th 224 and *Capri v. L.A. Fitness Intern., LLC* (2006) 136 Cal.App.4th 1078, argue that since the *Tunkl* decision the courts have made it clear that a party cannot contract away liability for his fraudulent or intentional acts, or for his negligent violation of statutory law, regardless of whether the public interest is involved. Plaintiffs further allege that "continuing" acts by Defendants create a "new" cause of action each time Defendants contract with an advertiser for its outdoor signs, and that these "new" causes of action are not covered by the Release.

Before addressing the application of Section 1668, the Special Master will address Plaintiffs' allegations that Defendants have engaged in "new" conduct not covered by the Release. The Special Master finds this argument unpersuasive. Pursuant to Proposition G, passed in March 2002, Defendants can no longer erect new outdoor signs, and thus any dispute between Plaintiffs and Defendants involving outdoor signs in the City was fixed at the time the parties signed the Release in December 2003. Furthermore, Defendants did not agree in the Release to cease its' advertising sign business. If that had been the Plaintiffs' intent the Release could have so provided. Accepting Plaintiffs' argument would mean that Defendants paid them to release only those acts that pre-dated the Release, and that the Release did not remove the threat of further legal action against Defendants in conducting the very same business with the very same outdoor signs after the date of the Release. As Defendants argue, this could not have been the intent of the parties because it presents an illogical interpretation of the Release. Plaintiffs could not possibly have believed that Defendants' conduct would not continue after the Release was signed. A contract should not be interpreted so as to produce an absurd result, but one that is reasonable. (Civ. Code section 1643: "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and

capable of being carried into effect, if it can be done without violating the intention of the parties.") Thus the Special Master finds that Plaintiffs' argument that Defendants have engaged in "new" conduct not covered by the Release to be an unreasonable interpretation of the Agreement and contrary to the apparent intent of the parties.

As for Plaintiffs' argument regarding the application of Section 1668, the Special Master acknowledges that some of the language in this provision on its face, as well as some of the cited cases, appear to be supportive of Plaintiffs' argument. Furthermore, Plaintiffs' argument that a contract need not involve the public interest in order to be in violation of section 1668 appears correct under the cases cited.

However, in his Tentative Ruling, the Special Master explained that upon further analysis of the case law in this area it appeared that section 1668 was *not* meant to apply to the present circumstances, *i.e.*, in which two businesses with equal bargaining power limit their future liability by executing a Release. At the March 22nd hearing Plaintiffs argued that the equality of the bargaining position factor was wholly irrelevant to the issue of the enforceability of the release for *intentional* wrongs. Plaintiffs' position, based largely on the *Health Net* and *Capri* cases,[21] is that under

---

[21] Plaintiffs also cite to 1 Witkin, Summary 10th (2005) Contracts, section 660, p. 737.

current law Defendants' intentional conduct can *never* be released under
section 1668. The Special Master has further considered Plaintiffs'
argument, but as will be explained below, finds them unpersuasive.

Turning first to the *Tunkl* decision, there the California Supreme
Court held that exculpatory clauses relieving a party from the consequences
of his or her own *negligence* were unenforceable when the public interest
was involved. The Court described factors or characteristics which
identified a transaction implicating the public interest: "(1) It concerns a
business of a type generally thought suitable for public regulation. (2) The
party seeking exculpation is engaged in performing a service of great
importance to the public, which is often a matter of practical necessity for
some members of the public. (3) The party holds himself out as willing to
perform this service for any member of the public who seeks it, or at least
any member coming within certain established standards. (4) As a result of
the essential nature of the service, in the economic setting of the transaction,
the party invoking exculpation possesses a decisive advantage of bargaining
strength against any member of the public who seeks his services. (5) In
exercising a superior bargaining power the party confronts the public with a
standardized adhesion contract of exculpation, and makes no provision
whereby a purchaser may pay additional fees and obtain protection against

negligence. (6) Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (*Tunkl v. Regents of University of California, supra,* 60 Cal.2d at pp. 98-101, fns. omitted.)

However, in *Health Net*, the Appellate Court refused to read a "public interest" requirement into the *Tunkl* decision. There plaintiff health plan provider contracted with the defendant Department of Health Services to be one of two health plans providing managed care services to Medi-Cal patients in a particular county. However, in violation of Welfare & Institutions Code section 14087.305(j) and its implementing regulations, the defendant assigned all who failed to select a plan to the competing health plan. The plaintiff sued for damages, but the contract contained an exculpatory clause providing that any remedies for non-compliance with laws not expressly incorporated into the contract did not include money damages. The Court of Appeal held there can be no exemption from liability for a violation of law, regardless of whether the public interest is involved (*Health Net of Cal., Inc. v. Department of Health Services, supra,* 113 Cal.App.4th at p. 234.)

A similar result was reached in *Capri v. L.A. Fitness Int'l, LLC* (2006) 136 Cal.App.4th 1078. There a member of the defendant fitness club sued

the fitness club for injuries he sustained when he slipped and fell on the club's pool deck. The Court of Appeal held that the plaintiff's action was not barred by the release clause in the membership agreement. The Court stated that the club was in violation of comprehensive statutes regulating swimming pools, and that these violations were the cause of plaintiff's injuries, and thus the release fell squarely within the explicit statutory prohibition against contractual exculpation for a violation of law and was invalid.

The court explained: "The court in *Tunkl* was concerned with the validity of an exculpatory clause to avoid responsibility for ordinary negligence. In such a case, *Tunkl* invalidates any exculpatory provision affecting the public interest. [Citation.] *Tunkl* did not, however, add a "public interest" requirement where the contract purports to avoid liability for fraud, willful injury, or violation of law, whether intentional or negligent. The plain language of section 1668 renders such exculpatory provisions invalid as against public policy, and nothing in *Tunkl* alters that. "It is now settled-and in full accord with the language of the statute-that notwithstanding its different treatment of ordinary negligence, under section 1668, 'a party [cannot] contract away liability for his fraudulent or intentional acts or for his negligent violations of *statutory* law,' regardless of

whether the public interest is affected." (*Capri v. L.A. Fitness Int'l, LLC, supra,* 136 Cal.App.4th, 1084.)

However, although no public interest requirement was critical to the holdings in *Health Net* and *Capri*, the Special Master notes that both cases would appear to independently meet the *Tunkl* factors, and the Court in *Health Net* so stated. Given that both *Health Net* and *Capri* are so factually distinct and involve different public policy concerns from the present case, suggests to the Special Master that regardless of whether the public interest factor is or is not present, a different result should be reached in this case.[22] As Defendants argue, the Release in question between Plaintiffs and Defendants was between two business entities with equal bargaining power, and not a consumer and a larger entity. The released conduct (Defendants' operation and maintenance of its advertising signs) was not only known to the parties but was the specific subject of the Release.[23] Indeed under similar circumstances courts have found section 1668 to be inapplicable (*Appalachian Ins. Co. v. McDonnell Douglas Corp.* (1983) 214 Cal.App.3d

---

[22] Furthermore, the Special Master notes that just because a business is regulated, does not mean it is within the "public interest' or would necessary meet the *Tunkl* test (*Appalachian Ins. Co. v. McDonnell Douglas Corp.* (1983) 214 Cal.App.3d 1, 20.)

[23] The Special Master notes that the Court in *Health Net* the Court was concerned with releasing a party from responsibility for *future and unknown* statutory and regulatory violations (*Health Net of Cal., Inc. v. Department of Health Services, supra,* 113 Cal.App.4th at p. 224.)

1; *CAZA Drilling (California), Inc. v. TEG Oil & Gas U.S.A., Inc.* (2006)
142 Cal.App.4th 453.)

The *CAZA* case is particularly instructive both in its reasoning and
historical analysis of the cases in this area. In *CAZA*, CAZA was hired by
TEG to drill a well ("Yule 6".) A few days after drilling began, there was a
blowout, resulting in the death of a CAZA employee, injury to others, and
complete destruction of Yule 6. CAZA filed a complaint against TEG,
alleging breach of contract and other causes of action. TEG filed a cross-
complaint seeking compensation for economic loss and physical harm to its
equipment and facilities in connection with the drilling blowout. The trial
court granted CAZA's summary judgment motion on the cross-complaint
based on an exculpatory clause in the drilling contract. On appeal, TEG
argued that the exculpatory and limitation of liability provisions in the
parties' agreement was invalid pursuant to section 1668 and the factors set
forth in *Tunkl*.

The Appellate Court disagreed, stating: "Although the [*Tunkl*] Court
did not specifically exclude contracts between relatively equal business
entities from its definition of contracts in the public interest, it is difficult to
imagine a situation where a contract of that type would meet more than one

or two of the requirements discussed in *Tunkl.* With respect to the second and third factors, for example, CAZA did not hold itself out as performing services for the public, but only for the small number of entities that happened to be oil field operators. While the production of oil is of great importance to the public, the drilling of a particular oil well is generally only important to the party who will profit from it. With respect to the fourth and fifth factors, appellants' argument that it was forced into an adhesion contract boils down to this: "Although two provisions in the agreement were altered during negotiations, we did not know we could alter any provisions during negotiations." The fact that TEG found itself backed into a corner in late 2002 as a result of failure to plan ahead and had no choice but to deal with the only company that had a suitable drill rig available at that specific point in time, is not the sort of unequal bargaining power to which the court in *Tunkl* referred." (*CAZA Drilling (California), Inc. v. TEG Oil & Gas U.S.A., Inc., supra*, 142 Cal.App.4th, 468-469.)

In so holding, the Appellate Court relied on the analysis in *Appalachian Ins. Co., supra*, 214 Cal.App.3d 1. The *CAZA* Court explained *Appalachian Ins. Co* was also a case in which commercial entities tried to undercut contractual limitations on liability by reliance on *Tunkl*.

28

The Appellate Court explained: "In [*Appalachian Ins. Co.*] a rocket manufactured by defendant McDonnell Douglas Corp. failed to boost a communications satellite to the required orbit. As a result, the satellite had to be written off as a total loss. The insurers of the satellite owner sought to recoup their loss from McDonnell Douglas, contending that limitation of liability provisions in the parties' agreement were contrary to public policy. With regard to plaintiffs' argument that McDonnell Douglas's services were open to any member of the public and provided a service of great importance to some members of the public, the court stated: "[T]he provision of space hardware and launch services is of practical necessity to no individual member of the public; it is of 'practical necessity' only to a few, very large commercial and governmental entities dealing in highly specialized fields such as telecommunications." ( *Appalachian Ins. Co. v. McDonnell Douglas Corp., supra,* 29.) Further, "all [sales] were to large, sophisticated commercial and governmental entities." ( *Id.* at p. 30.) With regard to the supposedly "'essential nature'" of the services, the court stated: "*Tunkl's* focus was on whether the service was 'essential' to individual members of the public. Here, the service is 'essential' only to a small number of large corporations and governmental entities; it 'is not a compelled, essential service' but 'a voluntary relationship between the

parties.' [Citation.] Finally, this case does not involve a 'decisive advantage of bargaining strength [used] against any member of the public who seeks [the] services.' *(Tunkl, supra,* 60 Cal.2d at p. 100) This case does not involve a large entity using its bargaining strength against an individual member of the public. This case involves two large, sophisticated corporations with relatively equal bargaining power who negotiated the terms of a voluntary agreement." ( *Ibid.,* fn. omitted.) (*CAZA Drilling (California), Inc*. v. *TEG Oil & Gas U.S.A., Inc*., *supra*, 142 Cal.App.4th, 468-469.)

The Appellate Court concluded: "The same is true here. CAZA's services may have been essential to TEG, but the agreement between the parties did not implicate the public interest in the way required to abrogate exculpatory provisions limiting liability for negligence under *Tunkl.*"

Next the Court addressed the *Capri* and *Health Net* decisions, distinguishing both cases: "If *Tunkl* were the only basis raised by appellants for the applicability of section 1668, we could end our analysis. However, in their cross-complaint and their opposition to the motion for summary judgment, appellants contend that CAZA violated various statutes and regulations in performing drilling activities. They argue that section

30

1668 invalidates any exculpatory language that would relieve CAZA of liability for performing drilling operations in violation of law "without regard to whether any public interest [was] involved." They cite for support this court's recent decision in *Capri v. L.A. Fitness International, LLC* (2006) 136 Cal.App.4th 1078, 39 Cal.Rptr.3d 425 ( *Capri* )."

The Appellate Court explained: "*Capri* is significantly different from the present case because it involved personal injury to a consumer. Here, the contract was between two business entities and the damages claimed are entirely economic. In only one recent case has a court applied section 1668 to invalidate provisions in a contract between business entities: *Health Net of California, Inc. v. Department of Health Services* (2003) 113 Cal.App.4th 224, 6 Cal.Rptr.3d 235 ( *Health Net* ).

However, the Court found the holding in *Health Net*, as with *Capri*, to be distinguishable. "[T]he exculpatory clause at issue in [*Health Net*] "prohibit [ed] ⋯ the recovery of *any damages at all* for DHS's statutory or regulatory violations" and "exempt[ed] DHS *completely* from responsibility for completed wrongs." [Citation.] The court believed that even in a commercial case, "an exculpation of any liability for *any* damages for *any* statutory violation surely rises to the level of an 'exempt[ion] from

responsibility' within the meaning of the plain language of section 1668."
[Citation.] The provisions at issue here do not exempt CAZA from all
liability, but merely limit its responsibility with respect to economic
damages. The court in *Health Net* expressly declined to decide whether
"*some* contractual limitations over the scope of available remedies" would "
necessarily run afoul of section 1668."

The Special Master finds that the facts and reasoning of the
*Appalachian Ins. Co* and *CAZA* cases not only more closely resemble this
case, but are persuasive. Presumably two business entities with equal
bargaining power should be able to voluntarily enter into a Release
Agreement whereby one pays the other in order to continue its' allegedly
wrongful conduct. The conduct thus ceases to be wrongful as against the
party who received consideration under the Release. This does not appear to
the Special Master to be the sort of Agreement that was meant to run afoul
of Section 1668, and is clearly distinguishable from the facts of the cases
cited by Plaintiffs in which the parties signed broad contracts releasing new,
unknown and unspecified wrongdoing that might happen in the future -- i.e.
in *HealthNet* the contract included an exculpatory provision releasing the
defendant from damages for *any* violation of statutory or regulatory law not
made part of the parties' contractual obligations, and in *Capri* the plaintiff

similarly signed a contract with a broad exculpatory clause for unknown future conduct.

The Special Master acknowledges that no case directly supports his conclusion,[24] but as explained above, a contrary conclusion would suggest that in many instances parties would be unable to settle a case because one party, for consideration, would not be allowed to release the other for its' wrongful conduct against that party. The Special Master finds that an interpretation of section 1668 which would stifle such settlements is unreasonable, and perhaps is why there is no case directly on point.

In other words, the Special Master finds that when two parties settle a case and a consideration is given in which a plaintiff allows a defendant to continue on with its' alleged wrongful conduct, that conduct is no longer wrongful, at least as to that particular defendant. Plaintiff in exchange for consideration is permitting that conduct to go forward in the future. The Special Master further notes out that the type of settlement described above occurs in other contexts, *i.e.*, intellectual property cases, patent infringement cases and contamination of property cases.[25] For example, a Plaintiff sues a Defendant for patent infringement. Defendant admits wrongful conduct but in exchange for a payment of money Plaintiff gives Defendant a license.

---

[24] Several cases related to this issue are currently pending before the California Supreme Court.
[25] Finally, the Special Master notes that nothing is to prevent another plaintiff or governmental entity from suing a party such as CBS for its wrongful conduct.

What was once wrongful conduct is now permitted. This is no different than our present situation where Plaintiff agreed in a business negotiation and for consideration to allow Defendants' alleged illegal signs to continue to be displayed. This does not violate or implicate Civil Code section 1668.

Thus the Special Master recommends a finding that that the Release Agreement would appear to bar all of Plaintiffs claims against Defendants CBS and Roche. However, in addition, as set forth below, an independent ground for dismissal rests on the basis that Plaintiffs have failed to allege sufficient facts to establish their causes of action for unjust enrichment, intentional interference with a business relationship, nuisance and antitrust violations.

IV. Unjust Enrichment:

Plaintiffs' cause of action for "unjust enrichment" is based on the allegation that whenever Defendants successfully lease their illegal signs, they receive the unjust benefit of lease payments taken from a pool of funds which is intended for and should be flowing to Plaintiffs' legally maintained signs. Plaintiffs argue the term "benefit" connotes "*any* type of advantage" and relief is available under an unjust enrichment theory whenever the circumstances show that as between two individuals it is unjust for the person receiving the benefit to retain it.

34

In his Tentative Ruling, the Special Master, as he had before, found Plaintiffs' allegations insufficient to state a cause of action for unjust enrichment.[26] At the March 22nd hearing, Plaintiffs agreed that they would not contest the Special Master's recommendation. For the benefit of the Court, explained below is the Special Master's basis for the recommendation.

First, Plaintiffs cannot state a claim for unjust enrichment because no such cause of action exists in California. Unjust enrichment is not a separate cause of action but is tied to other causes of action. (*Melchoir v. New Line Productions, Inc.* (2003) 106 Cal.App.4th 779; *Enreach Tech., Inc. v. Embedded Internet Solutions, Inc.* (N.D. Cal. 2005) 403 F.Supp.2d 968, 976; *McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1490.)

As the court in *Melchoir* explained: "The phrase 'Unjust Enrichment' does not describe a theory of recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so." (*Lauriedale Associates, Ltd. v. Wilson* (1992) 7 Cal.App.4th 1439, 1448.) *"Unjust enrichment is 'a general principle, underlying various legal doctrines and remedies,' rather than a remedy itself."* (*Dinosaur Development, Inc. v. White* (1989) 216 Cal.App.3d 1310, 1315.) It is

---

[26] As set forth above, the Special Master earlier recommended that Plaintiffs attempt to amend their complaint against Clear Channel to add a cause of action for unjust enrichment be denied. Such recommendation was adopted and so ordered by the Court.

synonymous with restitution. (*Id.* at p. 1314.) (*Melchoir v. New Line Productions, Inc.*, *supra*, 106 Cal.App.4th at p.793; *emphasis added.*)

Or, as stated recently in *McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457: "There is no cause of action for unjust enrichment. Rather, unjust enrichment is a basis for obtaining restitution based on quasi-contract or imposition of a constructive trust. (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 1015, 1016, pp. 1104-1105.)" (*Id.* at p. 1490.)

Second, as set forth above, unjust enrichment is founded on principles of restitution. As Defendants argue, *even if* unjust enrichment existed as a cause of action, Plaintiffs have not plead sufficient facts to maintain the action, because it requires a plaintiff plead facts establishing that he is seeking return of something he paid directly to the defendant (*First Nationside Sav. v. Perry* (1992) 11 Cal.App.4th 1657, 1662; Rest., Restitution, § 1.[27]) Plaintiffs have failed to plead they paid any money or gave any property to any Defendants which such Defendant now unjustly retains.

---

[27] Specifically Comment "b" to Section 1 provides: "A person confers a benefit upon another *if he gives to the other possession of or some other interest in money, land, chattels, or choses in action*, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage." (*Emphasis added.*)

36

In their briefing Plaintiffs, relying on *County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, argued that Defendants view of restitution is too narrow, and that it is not essential that money be paid directly to the recipient by the party seeking restitution.

Plaintiffs' reliance on *County of Solano* is misplaced. In *Solano* the money at issue was specifically earmarked for the County, but used by the City. The decision accurately reflects the principle that restitution exists for the purpose of restoring the status quo by returning to a plaintiff funds in which he or she has an ownership interest. This is to be contrasted with Plaintiffs' claim for the advertising revenue that Defendants receive through their contracts with advertisers, and in which Plaintiffs have no ownership interest. (*See Korea Supply v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1149 (lost profits are not recoverable as restitution because competitors have no ownership interest in profits sought).)

Therefore, for the reasons stated above, the Special Master finds that Plaintiffs have failed to state a claim for which relief may be granted. The Special Master recommends that Plaintiffs *not* be given leave to amend their Complaint against Defendants, because it appears to the Special Master that under no circumstances could Plaintiffs allege sufficient facts to state a claim for unjust enrichment.

## V. Intentional Interference with Prospective Economic Advantage

The Special Master finds Plaintiffs cause of action for intentional

interference with prospective economic advantage is deficient for two

separate reasons. First, it appears to be *time barred* because Plaintiffs have

not alleged that Defendants engaged in any conduct within the applicable

statute of limitations.

The statute of limitations for the tort of intentional interference with

prospective economic advantage is *two years* (Cal. Code Civ. Proc. section

339(1); *Knoell v. Petrovich* (1999) 76 Cal.App.4th 164, 168.) Plaintiffs filed

this Complaint on August 3, 2006, and thus Plaintiffs cannot state a viable

claim for relief for intentional interference with prospective economic

advantage unless the alleged conduct arose on or after August 3, 2004.

However, the allegations of interference contained in Plaintiffs'

Complaint are either not time specific, or stem from sales which occurred

*prior* to May 2004. Furthermore, although Plaintiffs attempt to plead around

this problem by alleging "ongoing transactions," they fail to identify any

particular transaction with which Defendants interfered within the requisite

two year period.

Plaintiffs alternatively argue that Federal Rule of Civil Procedure 8(a)[28] does not require allegations of specific acts of interference and simply requires that a claimant make a "short and plain statement" of his claim showing that he is entitled to relief.

The Special Master finds Plaintiffs' argument unpersuasive. As discussed below, a critical element of this tort is the existence of an identifiable economic relationship between a plaintiff and a third party which contains a probability of future benefit to the plaintiff. The cases hold that vague allegations are insufficient. Plaintiffs fail to point to any authority which states that Rule 8(a) excuses this pleading requirement. In fact in the case cited by Plaintiffs, *Davis v. Olin* (D.Kan. 1995) 886 F.Supp. 804, the Court goes on to state that a plaintiff is still required to "set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," and furthermore, "[Rule 8(a)] still requires minimal factual allegations on those material elements that must be proved to recover." (*Id.* at p.808.)

Second, even if the claim was not time barred, Plaintiffs' Complaint fails to allege all of the necessary elements of the tort. "The elements of a

---

[28] Rule 8(a) states: A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded.

cause of action for interference with prospective economic advantage are:
(1) an economic relationship between the plaintiff and a third party, with the
probability of future economic benefit to the plaintiff; (2) the defendant's
knowledge of the relationship; (3) the defendant's intentional and wrongful
conduct designed to interfere with or disrupt this relationship; (4)
interference with or disruption of this relationship; and (5) economic harm to
the plaintiff proximately caused by the defendant's wrongful conduct." (*Sole
Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 241 citing
*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153-
1154.)

Plaintiffs' allegations regarding the first element are particularly
weak. The first element requires that the economic relationship be a
*specific, existing relationship* out of which the probability of economic
benefit exists. However, Plaintiffs do not allege a single economic
relationship in the "mini-zip code markets" where Defendants allegedly
illegal signs compete with their signs, nor do they allege they were not able
to expand existing relationships or develop additional relationships. Rather
Plaintiffs point to relationships with historic customers and allege they
would have a reasonable expectation for future economic benefit with these

customers but for Defendants' conduct.[29]  The Special Master finds that such allegations are insufficient under applicable case law.

In *Westside Center Assocs. v. Safeway Stores 23 Inc.*, (1996) 42 Cal.App.4th 507, the plaintiff Westside sued the defendant Safeway for interference with prospective economic advantage allegedly caused by the defendant's closing its anchor supermarket in the center, removing the fixtures, and then exercising an option to renew the lease for five years, allegedly with the intent to drive down the price of the center so the defendant could buy it at an artificially low price.  The plaintiff claimed that the defendant interfered not with a particular sale, but with the plaintiff's "opportunity" to sell the property for its true value.

The Court of Appeal held that the plaintiff's "interference with the market" allegation failed to provide any factual basis upon which to determine whether the plaintiff was likely to have actually received the expected benefit.  The Court found that without an existing relationship with an identifiable buyer, the plaintiff's expectation of a future sale was at most a "hope" for an economic relationship and a desire for future benefit.  Thus, plaintiff's "interference with the market" theory of liability, by itself, was insufficient as a matter of law to show plaintiff had an economic relationship

---

[29] However, the Special Master notes that the only authority cited by Plaintiffs for this proposition is an out of state case – *Walsh v. Irwin Stern's Costumes* (E.D. Pa. 2006) 2006 WL 2380369.)

with a prospective buyer which was reasonably likely to produce a future
beneficial sale of its property.

The Court explained: "Where a contract exists, it identifies the
particular interest with which the defendant has allegedly interfered and
hence serves to establish both the fact and the amount of the plaintiff's
resulting damages. For similar reasons, the sort of 'expectancies' the law
typically protects are those of future contractual relations. [Citation.] 'In
such cases there is a background of business experience on the basis of
which it is possible to estimate with some fair amount of success both the
value of what has been lost and the likelihood that the plaintiff would have
received it if the defendant had not interfered.' (Prosser & Keeton, The Law
of Torts, *supra*, § 130, p. 1006; *see also* 2 Harper *et al.*, The Law of Torts
(2d ed. 1986) § 6.11, p. 345.) Nonetheless, the chance the expectancy
otherwise would have occurred is necessarily a matter of some uncertainty.
The law precludes recovery for overly speculative expectancies by initially
requiring proof the business relationship contained 'the *probability* of future
economic benefit to the plaintiff.'" [Citations.] 'Although varying language
has been used to express this threshold requirement, the cases generally
agree it must be reasonably probable that the prospective economic
advantage would have been realized but for defendant's interference.'"

(*Westside Center Assocs. v. Safeway Stores 23 Inc.*, *supra*, 42 Cal.App.4th at p.522.)[30]

Similarly in *TPS Utilicom Servs., Inc. v. AT&T Corp* (C.D. Cal. 2002) 223 F.Supp.2d 1089 the Court stated: "An allegation of interference with a *potential* customer is too speculative to state a claim for interference with prospective economic advantage. [para.] [TPS's] complaint alleges no more than interference with potential customers with which TPS has no existing relation. ("TPS had a valid and enforceable expectation of an economic relationship with thousands of consumers residing in markets *it plans to serve.*") TPS misplaces the law's emphasis on expectations: an expectation of an economic relation is not actionable. Rather, an expectation of economic advantage based on an ongoing economic relationship is required. TPS has not stated a claim for interference with prospective economic advantage." (*Id.* at p. 1106.)

Here Plaintiffs fail to allege a specific economic relationship with any particular ad agency or advertiser with which it has an existing economic relationship and with which Defendants have interfered. Their allegations at most express the hope for a future economic relationship. In other words,

---

[30] Plaintiffs attempt to distinguish *Westside Center* by arguing that there the economic relationship being alleged was *Westside Center's* relationship with the entire market of all possible but as yet identified buyers for its property, and here the Complaint names three outdoor advertising agencies with which Plaintiffs have historically sold advertising space. While true, this does not excuse Plaintiffs from the requirement that the plead relationships must be *more than an expectation*.

Plaintiffs' allegations consist of general allegations of interference with the outdoor advertising market generally, but fail to allege an existing, concrete relationship with a specific and identifiable advertiser or agency with which any of the Defendants interfered. Such allegations are insufficient to satisfy the first element of a cause of action for interference with prospective economic advantage.

The Special Master also finds Plaintiffs have failed to make sufficient allegations with respect to the remaining elements of the tort. For example, the second element requires that Defendants have knowledge of the existing economic relationship. However, Plaintiffs make general allegations that Defendants were aware of Plaintiffs' relationship with major national ad agencies, and that such agencies would not place ads on Defendants' sign if they knew they were not legally permitted.[31] But Plaintiffs fail to allege that Defendants knew of any *specific* existing relationship with a particular ad agency with which a Defendant interfered.

The third and fourth elements require that Plaintiffs plead and prove intentional acts designed to and which actually disrupt a specific, existing relationship. However, here too Plaintiffs make general allegations that Defendants' acts diverted part of the advertising market from Plaintiffs, but

---

[31] Plaintiffs also allege that Roche, as CBS's Northern California District General Manager and most knowledgeable employee was aware of Plaintiffs' relationship with major national agencies.

fail to allege any link between these alleged acts and any design or disruption of an existing economic relationship.

Finally, the fifth element requires that Plaintiffs allege they have sustained damages proximately caused by Defendants alleged interference with an existing relationship. However based on the pleadings the harm Plaintiffs allege, *e.g.*, depressed rates at which Plaintiffs signs have been sold in the past – could just as readily been caused by market conditions than by any intentional act of Defendants.

In his Tentative Ruling the Special Master found that Plaintiffs had failed to state a claim for intentional interference with prospective economic advantage and that this cause of action be dismissed. The Special Master further recommended that Plaintiffs be given one final opportunity to amend the Complaint to plead a *specific* economic relationship that was interfered with *within the two year statute of limitations*. At the March 22nd hearing the Plaintiffs did not contest this recommendation. Although the Special Master is prepared to make his tentative ruling his final recommendation, it must be emphasized that Plaintiffs, if they choose to amend, must specifically plead the elements of this cause of action as explained outlined above, and if Plaintiffs fail to do so, the Special Master recommends that this cause of action also be dismissed without leave to amend. Furthermore, if

45

the Court finds the Release bars all claims against Defendants CBS and Roched, this cause of action may only be amended as to the remaining Defendants.

## VI. Claim for Public and Private Nuisance

The Special Master initially notes that Plaintiffs' previous attempts to state a cause of action for public and private nuisance have been unsuccessful. In January 2003, in ruling on Defendant's Motion to Strike Plaintiffs' Amended Complaint, Judge Conti dismissed Plaintiffs' nuisance claim. Judge Conti stated that while "[n]uisances are broadly defined . . . the definition is not inclusive of all types of injury," and normally involved some type of "physical interference." Judge Conti acknowledged that a city ordinance may designate an activity as a per se public nuisance, but a plaintiff must still allege some "special injury" arising out of the nuisance. Judge Conti concluded that the harms Plaintiffs had alleged, *i.e.*, that Defendants' conduct skews the rental market for advertising space, is unrelated to a nuisance because this activity does not interfere in any physical way with the use of their property. In addition, Judge Conti ruled that even if the signs did constitute a per se public nuisance; Plaintiffs had not alleged some "special injury" arising out of the nuisance. Plaintiffs were *not* given leave to amend.

In December 2005, the Special Master reached a similar conclusion

when he ruled on Plaintiffs' Motion for Leave to file a Third Amended

Complaint. Again Plaintiffs were *not* given leave to amend. In his Tentative

Ruling, the Special Master found that Plaintiffs' most current attempt to set

forth a nuisance claim suffered from the same flaws as previously set forth

by the Court and Special Master. At the March 22nd hearing, Plaintiffs

argued that their leasehold interest is a real property right and if it loses

value, due to decreased rental income from Defendants' nearby illegal signs,

this economic impact is sufficient to state a cause of action for nuisance --

i.e. no physical interference is required. The Special Master agrees with

Plaintiffs that a holder of a leasehold interest may maintain an action for

nuisance, but finds no merit in Plaintiffs' "economic impact" argument.

Thus the Special Master still finds that Plaintiffs have failed to state a cause

of action for nuisance.

Plaintiffs' present Complaint again alleges causes of action for *both*

public and private nuisance. First, Plaintiffs' allege that the *per se* nuisance

created by Defendants illegal signs is a *public* nuisance concerning

*aesthetics and safety*, per the City Planning and Building Code.[32]

---

[32] Plaintiffs' argument is based on Section 611(f) which provides that the City deems a prohibition on all new advertising signs is necessary because the increased size and number of general advertising signs in the City can distract motorists and pedestrians creating public safety hazards, and because the advertising

Second, Plaintiffs allege that Defendants' continuing maintenance of its' illegal signs constitutes a *private* nuisance, because the maintenance of said signs interferes with Plaintiffs' property rights as leaseholders of their signs in the relevant markets. As stated above, Plaintiffs are arguing that the use and enjoyment of their leased signs depends entirely on their ability to generate cash flow from those signs, and to the extent that Defendants' illegal signs prevent Plaintiffs from realizing that cash flow, Defendants are interfering with Plaintiffs present ability to use and enjoy their property.

Finally, in their briefing Plaintiffs also argued that the alleged nuisance does have a *physical* component, *i.e.*, sight obstruction or "clutter," which directly involves sensory perception. Plaintiffs' somewhat novel theory rests on the claim that the interference stems from the visual proximity of the illegal signs to their legal signs. Plaintiffs argue that this visual clutter "is to the eyes, what loud music is to the ears, and is no less a sensory perception than noxious fumes are to the nose." Plaintiffs also use this visual clutter theory to argue that *res judicata* and collateral estoppel principles are not applicable because these are newly discovered facts, *i.e.*, that this concept of clutter was first discovered in May 2006.

---

signs contribute to blight and visual clutter as well as the commercialization of public spaces within the City.

As set forth in *Newhall Land & Farming Co. v. Superior Court* (1993) 19 Cal.App.4th 334: "Civil Code section 3479 defines a nuisance as '[a]nything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property ....' A nuisance may be a public nuisance, a private nuisance, or both ( *Venuto v. Owens-Corning Fiberglas Corp.* (1971) 22 Cal.App.3d 116, 124.) 'A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal.' (Civ. Code, § 3480.) Every other nuisance is private. (Civ. Code, § 3481.) '[A] private person may maintain an action for a public nuisance, if it is *especially* injurious to himself, but not otherwise.' (Civ. Code, § 3493.)" (*Newhall Land & Farming Co.* v. *Superior Court, supra,* 19 Cal.App.4th at p.342; emphasis added.)

As with Plaintiffs' previous nuisance claim, the Special Master finds this one suffers from the same defect, *i.e.*, it lacks an allegation of any sort of *physical* interference. Plaintiffs' attempt to allege "new facts" and that the nuisance does have a physical component, *i.e.*, that the illegal signs are some sort of "clutter," the Special Master finds unconvincing. It appears to the

Special Master that Plaintiffs must have been aware of the factual underpinnings of its clutter theory prior to May 2006, particularly since no new outdoor advertising signs have been erected in the City since the passage of Proposition G in 2002. Thus the Special Master finds that Plaintiffs cannot simply use a new term ("clutter") to describe an already existing condition, and then argue it creates a "new fact" upon which to base a nuisance claim.[33]

Furthermore, the Special Master does not find that Defendants' sales of ads on its signs and purported representations as to the legal status of those signs are an interference to the use and enjoyment of Plaintiffs property. Plaintiffs allege no physical interference, obstruction, damage or diminution of enjoyment of their property, or that Plaintiffs' signs are obscured.

Furthermore, a private person may maintain an action for a public nuisance, if it is *specially* injurious to himself, but not otherwise. However, in alleging the right to bring a public nuisance as a private plaintiff, Plaintiffs do not allege a separate injury. Rather Plaintiffs appear to be alleging a separate nuisance from that affecting the public. The public nuisance alleged by Plaintiffs which affects the public is one that concerns

---

[33] Given this conclusion, the Special Matter believes that principles of collateral estoppel and/or *res judicata* may constitute separate grounds for barring Plaintiffs' present nuisance claim.

"aesthetics and safety." In contrast, the private nuisance alleged by
Plaintiffs is one of "clutter," which prevents it from placing certain
advertising on its signs. However, this is not a special injury flowing from
the aesthetics and safety of Defendants' signs, and thus does not appear to
support a private nuisance claim.

Furthermore, Plaintiffs' argument that Defendants' signs, by their
mere presence interfere with Plaintiffs' ability to sell advertising space and
thus make a profit, does not constitute nuisance. "The essence of a private
nuisance is an interference with the use and enjoyment of land" and "...
without it, the fact of personal injury, or of interference *with some purely
personal right*, is not enough for such a nuisance." (Prosser on Torts (3d ed.)
p. 611 and fn. 91 at p. 611 ( *Venuto v. Owens-Corning Fiberglas Corp,
supra,* 22 Cal.App.3d at pp.124-125; emphasis added).

Therefore the Special Master recommends that in light of the history
of prior dismissals Plaintiffs' nuisance claim be dismissed *without leave to
amend.*

## VII. Antitrust Allegations

Plaintiffs' antitrust claim stems from their allegation that Defendants'
illegal signs result in an increase in the supply of advertising space in the
City, thus driving down advertising prices. Plaintiffs further argue they have

adequately pleaded all the other requisite elements to establish a claim for monopolization or attempted monopolization pursuant to Section 2 of the Sherman Antitrust Act. In his Tentative Ruling the Special Master found, for the reasons set forth below, that Plaintiffs had failed to establish their antitrust claim. At the March 22nd hearing Plaintiffs did not contest the Special Master's Tentative Ruling.

To state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must prove: (1) possession of monopoly power in the relevant market; and (2) willful acquisition or maintenance of that power (as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident.) To state an attempt to monopolize claim a plaintiff must prove: (1) the defendant had specific intent to control prices or destroy competition; (2) the defendant engaged in predatory or anticompetitive conduct to accomplish the monopolization; and (3) a dangerous probability of the defendant achieving monopoly power. In addition, both monopoly and attempted monopoly claims must allege the requisite antitrust injury (*Pacific Express, Inc. v. United Airlines, Inc.* (9th Cir. 1992) 959 F.2d 814, 817.)

The Special Master finds that both Plaintiffs' monopoly and attempted monopoly antitrust allegations fail to set forth the requisite elements of these

claims. First, Plaintiffs fail to allege how two companies (Clear Channel and CBS) who Plaintiffs allege each have 47.5% of the market, could possess *monopoly* power. By definition, neither could be a monopolist because they have an *equal* share of the market. At best Plaintiffs have alleged an *oligopoly*. However, Section 2 of the Sherman Act does not punish behavior aimed at creating or maintaining oligopolies. "To pose a threat of monopolization, one firm *alone* must have the power to control market output and exclude competition. [Citation.] An oligopolist lacks this unilateral power. By definition, oligopolists are interdependent. An oligopolist can increase market price, but only if the others go along." (*Rebel Oil Co., Inc. v. Atlantic Richfield Co., Inc.* (9th Cir. 1995) 51 F.3d 1421, 1442-1443, *cert. denied* 516 U.S. 987 (1995); *see also U.S. v. Syufy Enterprises* (9th Cir. 1990) 903 F.2d 659, 664 ["There is universal agreement that monopoly power is the power to exclude competition or control prices."].) As Defendants argue, because Clear Channel and CBS are both major competitors in the outdoor sign market, each could undersell the other should one raise prices to a "supra competitive" level. Thus, the Special Master finds that Plaintiffs have not alleged possession of monopoly power by the Defendants.

Second, Plaintiffs fail to allege a defined *market*. In fact Plaintiffs allege two different relevant markets – outdoor advertising in the City generally, and outdoor advertising in the "mini-zip code markets." Plaintiffs argue pleading alternative markets is sufficient because the process of defining a relevant market is a factual inquiry for the jury, citing *High Technology Careers v. San Jose Mercury News* (9th Cir. 1993) 996 F.2d 987, 990.)

The Special Master finds *High Technology Careers* to be distinguishable. As Defendant Clear Channel points out in its' Reply Briefing, *High Technology Careers* did not address *pleading* requirements. Rather it was a case denying the defendant's summary judgment motion on the issue of market definition because both the plaintiff and the defendant in *High Technology Careers* had proposed relevant markets, and the Court held it could not determine which market definition was applicable as a matter of law. However, here Plaintiffs cite no authority supporting their argument that it is permissible to allege alternative geographic markets in their complaint and rely on the finder of fact to work out the details of those markets later.

In addition, the market allegations are vague and conclusory. For example, the Special Master finds that Plaintiffs fail to adequately describe

what they mean by a "mini zip code market." The Sherman Act requires a

*clear* definition (*Morgan,* Strand, *Wheeler & Biggs v. Radiology, Ltd.* (9th

Cir. 1991) 924 F.2d 1484, 1490.) Furthermore, a market definition

sufficient to withstand a motion to dismiss consists of two specific elements.

A plaintiff must plead the "product market" and the "geographic market."

(*Los Angeles Memorial Coliseum Commission v. N.F.L.* (9th Cir. 1984) 726

F.2d 1381, 1392; *cert. denied*, 469 U.S. 990 (1984).) Plaintiffs have failed

to adequately define either relevant market.[34]

Finally, the Special Master finds that the most critical flaw in

Plaintiffs' antitrust allegations is that they fail to plead an *antitrust injury*,

which is a critical element to both a monopolization and attempted

monopolization claim. Plaintiffs' Complaint alleges that Defendants' illegal

signs have improperly increased the supply of advertising signs in the City,

enabling Defendants to offer volume discounts and package deals, driving

*down* the price of selling advertising space on City signs. Plaintiffs further

allege that Defendants' advertising prices in the City are *lower* than prices

for other markets.

"The antitrust injury doctrine of *Atlantic Richfield Co. v. USA*

*Petroleum Co.,* 495 U.S. 328, (1990); *Cargill, Inc. v. Monfort of Colorado,*

---

[34] Alternatively Plaintiffs seek leave to amend to clarify its allegations (*see* Plaintiffs' Opposition Brief p.14, fn.8.)

*Inc.,* 479 U.S. 104, 107 (1986); and *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, (1977), requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers. *(Isaksen v. Vermont Castings, Inc.,* 825 F.2d 1158 (7th Cir.1987); *Local Beauty Supply, Inc. v. Lamaur, Inc.,* 787 F.2d 1197 (7th Cir.1986);" *Chicago Prof. Sports Ltd. P'ship* v. *National Basketball Ass'n* (9th Cir. 1992) 961 F.2d 667, 670, *cert denied,* 506 U.S. 954.) According to Plaintiffs' allegations, it appears that consumers are presently actually better off because the acts of Defendants which Plaintiffs object to neither reduce output nor raise prices, *i.e.*, the acts of Defendants appear to be pro-competitive.[35]

In other words, it appears to the Special Master that Plaintiffs' allegations appear to show at most injury *to them.* However, the antitrust laws were enacted for "the protection of competition not competitors" *(Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* (1977) 429 U.S. 477.) "[P]rivate plaintiffs can be compensated only for injuries that the antitrust laws were intended to prevent. *[Id.]* To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award

---

[35] This also applies to Plaintiffs' argument that the "antitrust injury" consists of advertising consumers not getting what they paid for, because they would not pay for advertising space on Defendants' signs if they knew they were illegal, *i.e.*, they are paying something for nothing. However, this is not an antitrust injury because this alleged harm has not decreased output nor raised prices. As explained *infra,* this at most harms Plaintiffs.

damages for losses stemming from acts that do not hurt competition [citation.] If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal *per se*" (*Rebel Oil Co., Inc. v. Atlantic Richfield Co., Inc.* (9th Cir. 1995) 51 F.3d 1421, 1443.)

The Special Master finds that the relief Plaintiffs seek actually appears contrary to the principles of antitrust jurisprudence. If one assumes Plaintiffs are correct in their allegation that Defendants' signs are illegal and result in an increased supply and lower pricing, than eliminating these signs from the market place will actually restrict competition and cause prices to rise. In other words, even assuming Defendants are selling advertising space on improperly permitted signs, this does not result in injury to competition but at most injury to Plaintiffs.

Finally, in their Opposition Brief, Plaintiffs for the first time attempt to set out a new claim against Defendants pursuant to the Unfair Practices Act, California Business and Professions Code Section 17000, *et seq*. It appears to the Special Master that this attempt by Plaintiffs to add a new claim without amending their Complaint is improper, and thus should not be entertained. If Plaintiffs plan to allege this claim, they should amend their pleadings accordingly. However, it also appears to the Special Master that

such amendment would be futile, because like their federal antitrust claims,

Plaintiffs must be able to allege, along with the other requirements for

maintaining an unfair practices claim, an injury to competition (*Kentmaster*

*Manufacturing Co. v. Jarvis Products Corp.* (9th Cir. 1998) 146 F.3d 691,

695 ["To prove a predatory pricing claim under Robinson-Patman requires

the same showing of unfair, anti-competitive pricing required to prove a

claim under section 2 of the Sherman Act."] However, as set forth above,

Plaintiffs have failed to plead a cognizable antitrust injury. Thus the Special

Master recommends that Plaintiffs' antitrust claim be dismissed without

leave to amend.[36]

## SUMMARY OF RULING

1. Clear Channels' motion to dismiss: The Special Master

recommends that Clear Channel's motion to dismiss Plaintiffs' 2002 lawsuit

against it based on the doctrine of abstention be denied. The Special Master

further recommends that the Court, as in its original Order of April 11, 2003,

continue to stay the action pursuant to the doctrine of primary jurisdiction

until a date set by the Court in November 2007, at which time the City's

enforcement of its sign ordinance can be reevaluated. Although the Special

Master will defer to the judgment of the Court, it is also recommended that

---

[36] The Special Master finds that if the problem with Plaintiffs' antitrust claim was only in alleging a
relevant market, leave to amend might be considered. However the Special Master's rationale for denying
leave to amend is that it appears that Plaintiffs do not and cannot allege an antitrust injury.

the stay apply to the 25 signs for which Judge Conti lifted his earlier stay. If after the November 2007 hearing the Special Master decides to recommend concluding the hearing as to the 25 signs, this matter can be done within the two to four month period following the hearing.

2. Defendants CBS and Roches' Motion to Dismiss: Although the Special Master finds no case which is exactly on point, for the reasons explained above the Special Master recommends a finding that that the Release Agreement appears to bar all of Plaintiffs' claims against Defendants CBS and Roche.

3. Nuisance, unjust enrichment and violations of the antitrust laws: Even assuming the Release is not valid as to Defendants CBS and Roche, the Special Master finds that Plaintiffs have failed to state causes of action against any of the Defendants for nuisance, unjust enrichment or violations of the antitrust laws.

4. Intentional interference with an economic relation: The Special Master recommends that Plaintiffs be allowed to amend their complaint regarding their cause of action for intentional interference with an economic relation. However, assuming the Court finds the Release as to Defendants CBS and Roche to be valid, this action only remains viable as to Defendant Clear Channel. Furthermore, although the Special Master recommends that

Plaintiffs be given one *final* opportunity to amend the Complaint, Plaintiffs

must plead a specific economic relationship that was interfered with within

the two year statute of limitations.

DATED: March _____, 2007.

The Honorable Eugene F. Lynch (Ret.)
Special Master

## PROOF OF SERVICE BY U.S. MAIL

Re: Advertising Display Systems, et al. vs. Clear Channel Outdoors
Reference No. 1100049288

I, Claire Vranicar, not a party to the within action, hereby declare that on March 30,

2007 I served the attached Report and Recommendation By Special Master on the parties in the

within action by depositing true copies thereof enclosed in sealed envelopes with postage thereon

fully prepaid, in the United States Mail, San Francisco, CALIFORNIA, addressed as follows:

Christine M. Morgan Esq.
Reed Smith LLP
Two Embarcadero Center
Suite 2000
San Francisco, CA 94111 USA

Gerald M. Murphy Esq.
Luce, Forward, Hamilton & Scripps LLP
121 Spear Street
Suite 200
San Francisco, CA 94105 USA

Duffy Carolan Esq.
Davis Wright Tremaine LLP
505 Montgomery Street
Suite 800
San Francisco, CA 94111-6533

Anthony M. Leones Esq.
Miller, Starr & Regalia
1331 N. California Blvd., 5th Fl.
P.O Box 8177
Walnut Creek, CA 94596

G. Patrick Watson Esq.
Powell Goldstein
One Atlantic Center, Fourteenth Floor
1201 W. Peachtree Street
Atlanta, GA 30309 USA

Samuel Conti
United States District Court

Scott David Baker Esq.
Reed Smith LLP
Two Embarcadero Center
Suite 2000
San Francisco, CA 94111 USA

Allison A. Davis Esq.
Davis Wright Tremaine LLP
505 Montgomery Street
Suite 800
San Francisco, CA 94111-6533

Martin L. Fineman Esq.
Davis Wright Tremaine LLP
505 Montgomery Street
Suite 800
San Francisco, CA 94111-6533

William B. Shearer, Jr. Esq.
Powell Goldstein
One Atlantic Center, Fourteenth Floor
1201 W. Peachtree Street
Atlanta, GA 30309 USA

Michele D. Floyd Esq.
Reed Smith LLP
Two Embarcadero Center
Suite 2000
San Francisco, CA 94111 USA

Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102  USA

I declare under penalty of perjury the foregoing to be true and correct. Executed at

San Francisco, CALIFORNIA, on March 30, 2007.

Claire Vranicar
JAMS The Resolution Experts